UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
RAMON VALENCIA, on behalf of himself and all : 
others similarly situated, :
:
Plaintiff, :
:
-against- :               **21 Civ. 00448 (PK)**
:
LIVE LION SECURITY LLC, BENJAMIN MEHREL, :
and JOSEPH JACOBOWITZ, :
:
Defendants. :
------------------------------------------------------------------ X

**AFFIRMATION OF LOUIS PECHMAN IN SUPPORT OF MOTION FOR
FINAL CLASS AND COLLECTIVE ACTION SETTLEMENT APPROVAL**

Louis Pechman, under penalty of perjury, affirms as follows:

1.      I am the principal attorney at Pechman Law Group PLLC ("PLG") in New

York, New York.  Along with Gianfranco J. Cuadra, a partner at PLG, I am one of the

attorneys primarily responsible for prosecuting the claims of Plaintiff Ramon Valencia

and opt-in Plaintiff Norelvi Serrano (together, "Plaintiffs") on behalf of themselves, the

Class, and the FLSA Collective.

2.      I am personally familiar with the facts and circumstances discussed below

and in the attached exhibits.

3.      Pursuant to the Court's Order dated February 22, 2022 (ECF No. 24)[1] (the

"Preliminary Approval Order"), I submit this affirmation in support of Plaintiffs'

Unopposed Motion for Final Approval of the Class and Collective Action Settlement (the

"Motion for Final Approval").[2]

---

[1]      References to "ECF" are to the Court's Electronic Case Files system and docket in the Action.

[2]      Unless otherwise defined, all capitalized terms and abbreviations used in this Affirmation have the
meanings assigned to them in the Parties' Joint Stipulation of Class and Collective Settlement and Release
(the "Stipulation"), attached as Exhibit "1."  All exhibits to the Stipulation are referenced here and in the

## BACKGROUND AND PROCEDURAL HISTORY

4.      Plaintiffs worked as security monitors at Live Lion, Defendants' surveillance and security business in Brooklyn, New York.  *See* ECF No. 1 ¶¶ 6, 25.  Live Lion employed individuals, such as plaintiffs, to remotely monitor its clients' worksites and business locations.  *Id.* ¶ 25.  If a crime occurred on a worksite, for example, a Live Lion security monitor would contact the local police on behalf of Defendants' client.  *Id.*

5.      Plaintiff Ramon Valencia filed his Complaint on January 27, 2021.  *See generally id.*  On March 15, 2021, Norelvi Serrano opted-in to the Action by filing a consent to sue form.  ECF No. 9.

6.      In his Complaint, Valencia alleges that Defendants paid him and all other security monitors on a straight time basis, meaning at the same hourly wage rate per hour worked, including per hour worked over forty per workweek.  *See, e.g.*, ECF No. 1 ¶¶ 1, 28–29, 44, 53.  For example, Valencia claims to have worked 47 hours on the workweek of September 5 to 11, 2018, and that Defendants paid him $14 per hour worked that week, including for each of his seven overtime hours.  *Id.* ¶ 32.

7.      The Complaint also alleges that Defendants paid Valencia and all other security monitors at the minimum wage rate and required them to work shifts longer than ten hours without paying them spread-of-hours pay of an extra hour of pay at the applicable minimum wage rate.  *Id.* ¶¶ 1, 30, 53, 73–76.  For example, Valencia claims that Defendants owe him $45 in unpaid spread-of-hours pay for the workweek of April 17 to 23, 2019, when he worked three shifts that were longer than ten hours.  *Id.* ¶¶ 34–35.

accompanying Memorandum by the prefix "Ex." and the letter designated to them in the Stipulation (*e.g.*, "Ex. A" refers to the CAFA Notice annexed to the Stipulation, Ex. 1 § II(2)).

8.      Finally, the Complaint alleges that Defendants failed to provide Valencia and all other security monitors with wage statements with their weekly wage payments and with wage notices at the time of hiring.  *Id.* ¶¶ 26–27.

9.      Valencia asserts his claims under the New York Labor Law ("NYLL") and Wage Theft Prevention Act ("WTPA") on a putative class action basis under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and his claim for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, on a putative collective action basis under 29 U.S.C. § 216(b).  *See id.* ¶¶ 43–83.

10.     On January 28, 2021, the Court issued an Initial Pretrial Discovery and Mediation Schedule.  ECF No. 5.

11.     On April 23, 2021, Defendants filed an Answer generally denying most material allegations concerning Plaintiff's WTPA claims and several of the hours Plaintiff alleged working.  *See* ECF No. 11.  Defendants also denied that certification under Rule 23 or the FLSA is proper in this Action or that other security monitors were "similarly situated" to Plaintiff.  *See generally id.* at ¶¶ 43–60.

12.     By joint letter dated June 16, 2021, the Parties informed the Court that they wished to mediate this case on a class-wide basis before a mediator from the Court-annexed mediation program.  ECF No. 12.  The Parties stated that they would first need to conduct limited class-wide discovery, so that Plaintiffs' counsel could calculate damages on a class-wide basis in anticipation of mediation.  *Id.*

13.     By electronic Order dated June 16, 2021, the Court granted the Parties' joint letter-motion and directed them to file a joint status report by August 31, 2021.

14.     Per the Court's Order, on August 30, 2021, the Parties filed a joint status letter informing the Court that they had exchanged all information necessary to attend a mediation on a class-wide basis and requesting a reference to the Court-annexed

mediation program.  ECF No. 13.  The Court granted the Parties' request by electronic Order dated August 30, 2021, which also directed the Parties to complete mediation by October 29, 2021.

15.     By electronic notice dated September 29, 2021, the Court's mediation program office informed the Parties that Philip Goldstein, Esq. was selected as mediator and that the first mediation session would take place by October 19, 2021.

## SETTLEMENT DISCUSSIONS AND MEDIATION

16.     On June 2, 2021, the Parties, through counsel, discussed the prospect of settlement, including the exchange of all time and pay records for all individuals who worked as security monitors at Live Lion.

17.     Between June 22 and June 24, 2021, Counsel for Defendants produced approximately 2,150 pages of payroll and time records for all potential Class Members and clarified that Live Lion did not start employing security monitors until late in 2017.

18.     The records reflected that many Live Lion security monitors did not work more than forty hours per workweek or shifts longer than ten hours per day.

19.     Relying on the documents produced, Plaintiffs' counsel calculated damages for the potential Class in August 2021 and shared the calculations and a settlement demand with Defendants' Counsel on August 25, 2021.  *See* Ex. F.  The Class's highest possible damages, inclusive of liquidated and statutory damages under the NYLL and WTPA, was $649,692.46.  A summary of the Class's highest alleged damages follows:

| | |
|---|---|
| Unpaid Overtime Wages (FLSA & NYLL) | $43,019.23 |
| Unpaid Spread-of-Hours Pay (NYLL) | $34,752.00 |
| Liquidated Damages (under NYLL) | $77,771.23 |
| NYLL § 195(1) Damages (WTPA notices) | $174,900.00 |
| NYLL § 195(3) Damages (WTPA paystubs) | $319,250.00 |
| **Total Alleged Damages:** | **$649,692.46** |

20.     On October 19, 2021, the Parties and their respective attorneys attended a mediation before Philip Goldstein, Esq.  Following over seven hours of negotiations, with Mr. Goldstein's help, the Parties reached a settlement in principle for $350,000.  At the mediation, Counsel for Defendants shared information showing that Defendants have financial difficulties and liquidity issues.  As such, as part of their settlement in principle, the Parties agreed that Defendants would be allowed to pay the $350,000 amount in monthly installments of $50,000.

21.     By October 27, 2021, the Parties finalized and signed a term sheet memorializing the primary terms of their Settlement.

22.     By Order dated November 8, 2021, the Court ordered the Parties to submit a status report by November 10, 2021, which the Parties then submitted.  ECF No. 15.

23.     By electronic Order dated November 10, 2021, the Court ordered the Parties to submit their settlement agreement and settlement approval letter pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015).

24.     On November 12, 2021, Plaintiffs' counsel submitted a joint letter-motion to the Court explaining that the Settlement in this Action is on a class basis, and so the procedures of Rule 23 apply.  ECF No. 17.  The letter-motion also explained that Defendants would fund the Settlement Payment of $350,000 in installments throughout 2022 due to liquidity and financial issues.  *Id.*  Because of this, and to avoid making installment payments to the Class, the Parties requested a prolonged briefing schedule. *Id.*  The Parties also submitted a proposed order referring the Action to the assigned Magistrate Judge for all purposes.  *See id.* at 2; ECF No. 16-1.

25.     By electronic Order dated November 15, 2021, the Court granted the letter-motion and ordered the Parties to file their preliminary approval motion by February 4, 2022.

26.     Plaintiffs' counsel drafted the Agreement in December 2021 and shared a draft of it with Counsel for Defendants on January 4, 2022.  Counsel for Defendants submitted edits to the Agreement on January 18, 2022.

27.     Plaintiffs signed the Stipulation on January 27, 2022.  *See* Ex. 1 at 18–19.

28.     On the same date, the Parties filed another joint letter-motion with a proposed order again requesting that this Action be referred for all purposes to the assigned Magistrate Judge.  ECF No. 18.

29.     On January 27, 2022, District Judge Kiyo A. Matsumoto referred this Action to Magistrate Judge Peggy Kuo for all purposes.  ECF No. 22.

THE PROPOSED SETTLEMENT TERMS AND STRUCTURE

30.     The Settlement provides for full resolution of all Class Members' FLSA, NYLL, and WTPA wage-and-hour claims in exchange for the receipt of a Settlement Check, in the case of state law claims, and the payment of a Settlement Share, in the case of FLSA claims.

31.     With respect to NYLL and WTPA state law claims, all Class Members who do not opt-out of the Rule 23 class action Settlement will become "Rule 23 Class Members."  Ex. 1 § II(36).  Plaintiffs and all Rule 23 Class Members will receive a Settlement Check.  *Id.* § XVI(2).  In exchange for their receipt of a Settlement Check, Plaintiffs and Rule 23 Class Members release Defendants from all wage-and-hour claims under the NYLL and WTPA, including claims for unpaid wages, liquidated damages, statutory damages, and attorneys' fees and costs that were pled or could have been pled in the Action.  *Id.* XVIII(2).

32.     As noted, Plaintiffs and all Rule 23 Class Members will receive a Settlement Check.  *Id.* §§ XVI(2), XVIII(2).  The back of every Settlement Check will contain the following statement next to the endorsement line:

**CONSENT TO JOIN AND FINAL RELEASE OF CLAIMS:**

By endorsing this check, I consent to join the FLSA collective action against Defendants styled *Valencia v. Live Lion Security LLC, et al.*, No. 21 Civ. 448 and release Defendants from all wage-and-hour claims under the Fair Labor Standards Act and the New York Labor Law brought or that could have been brought in the Action, including but not limited to unpaid overtime wages, spread-of-hours pay, and claims for statutory penalties under the Wage Theft Prevention Act.

_____   Dated:_____
Signature

Any modification or amendment of the above language by the Class Member is unacceptable and may, at Defendants' sole discretion, void the Settlement Check.

*Id.* § XVII(4).  Only by endorsing and cashing his or her Settlement Check does a Rule 23 Class Member become an FLSA Collective Member and opts-in to this Action under 29 U.S.C. § 216(b).  *See id.* §§ II(23), XVI(2), XVII(4).  To prevent fraud, the front of each Settlement Check will reflect the following statement in capitalized bold-typeface letters: "**ATTENTION:  ONLY THE RECIPIENT TO WHOM THIS CHECK IS WRITTEN MAY DEPOSIT AND/OR CASH THIS CHECK.   THIS CHECK IS NON-TRANSFERABLE.**" *Id.* § XVII(5).

33.     In exchange for the receipt of a Settlement Share (*i.e.*, the actual cashing of the Settlement Check and receipt of funds), Plaintiffs and FLSA Collective Members release the Released Parties from all wage-and-hour claims under the FLSA, including claims for unpaid wages, liquidated damages, and attorneys' fees and costs that were pled or that could have been pled in the Action.  *Id.* § XVIII(3).  To be clear, no Class Member in this Settlement can release claims under the FLSA without endorsing and cashing his or her Settlement Check. *See id.*  §§ II(24), XVI(2), XVIII(3).

34.     Defendants shall deposit $350,000 (the "Settlement Payment") into the Qualified Settlement Fund, or QSF (*i.e.*, a bank account), in equal monthly installment

payments on the first day of each month following twenty (20) days from the Court's entry of the Preliminary Approval Order until October 1, 2022. *Id.* §§ II(33), II(40), XV(2).

35.     The Stipulation calls for payment of combined service awards of $10,000 to Plaintiff Ramon Valencia and $5,000 to opt-in Plaintiff Norveli Serrano, Class Counsel's fees of 33.33% of the Settlement Payment (*i.e.*, $116,666), up to $1,300 to Class Counsel for reimbursement of costs incurred in the prosecution of the Action, and up to $18,000 as fees of the Claims Administrator.  *Id.* § XI.  The Class Representatives alone release all claims against Defendants in exchange for their eligibility for their respective service awards.  *Id.* § XVIII(1).

36.     The Stipulation calls for the creation from the Settlement Payment of a temporary Reserve Fund of $20,000 to be used to address and pay for modifications of Settlement Shares of Class Members who (a) prove their Settlement Share was miscalculated or (b) prove they were inappropriately excluded from the Settlement, because they were not in Defendants' payroll records.  *Id.* § XII(1)–(3).  The Reserve Fund shall cease to exist, and the funds in it will revert back to the QSF and be redistributed to all Class Members, fourteen (14) days before the Final Approval Hearing.  *Id.* § XII(1).

37.     The "Net QSF" is the money amount remaining of the Settlement Payment for distribution to the Class Members after (a) adding back in whatever remains of the Reserve Fund and (b) deducting the Class Representatives' service awards, Class Counsel's attorneys' fees and costs, and the Claims Administrator's fees.  *See id.* II(26), XVI(1).  Assuming the Reserve Fund is never used, as the Parties' anticipate (*see infra*), the Net QSF is $205,929.83, equal to the Settlement Payment of $350,000 minus $15,000 in service awards, $116,666 in Class Counsel's fees, $1,139.50 in Class Counsel's costs, and $11,264 in Claims Administrator fees.  *See id.* XVI(1); *see* Ex. F.

38.     As noted, Class Counsel calculated damages for each Class Member.  *See* Ex. F at Cols. Q–V.  The amount due to each Class Member in unpaid wages (*i.e.*, spread-of-hours pay and overtime wages combined) plus NYLL liquidated damages is set forth in Column W of Exhibit F, titled "Wages Plus LDs."  *See* Ex. F at Col. W.  For example, Plaintiff Valencia is owed $10,872.32, equal to $5,436.16 in unpaid wages plus an equal amount in liquidated damages under the NYLL.  Ex. F at Cols. Q–S, W, Row 114.  The Class is allegedly owed $155,542.26 in total combined alleged unpaid overtime wages, spread-of-hours pay, and liquidated damages under the NYLL.  *Id.* at Col. W, Row 122. On average, Class Members' total unpaid wages (*i.e.*, overtime plus spread-of-hours) is $605.90.  *Id.* at Col. Q, Row 125.  The highest amount due to any Class Member in spread-of-hours pay, overtime wages, and NYLL liquidated damages is $9,052.73, and the lowest amount due for the same is $1.28.  *Id.* at Col. S, Rows 125–27.

39.     The Net QSF of $205,929.83 minus the $155,542.26 owed to the Class in alleged unpaid wages and liquidated damages yields $50,387.37.  *Id.* at Col. W, Rows 130–32.  If the Settlement is approved, this amount will be distributed proportionally among all Class Members to pay for part of their respective WTPA damages after paying for all alleged unpaid wages (*i.e.*, overtime and spread-of-hours) and liquidated damages (*i.e.*, the full amounts in Column W, Exhibit F).  Combined, all Class Members are allegedly owed $494,150 in WTPA damages.  *Id.* Col. X, Row 122.  Each Class Member's alleged WTPA damages divided by the total WTPA damages due to the Class yields a percentage, as reflected in Column Y, which Class Counsel multiplied by the $50,387.37 remaining in the Net QSF to calculate each Class Member's share of WTPA damages paid. *See id.* at Col. Z (reflecting share of $50,387.37 that each Class Member will receive, equal to his or her Percentage of WTPA reflected in Column Y times $50,387.37).

40.     For example, Plaintiff Ramon Valencia claims he is owed $10,000 in WTPA damages.  *Id.* at Col. X, Row 114.  That number divided by $494,150 equals 2.04%, which multiplied by $50,387.37 yields $1,025.91.  *Id.* at Cols. Y–Z, Row 114.  Valencia's Settlement Share is $11,898.23, equal to his $10,872.32 owed in unpaid wages and liquidated damages plus his $1,025.91 share of the $50,387.37 being distributed to pay for the Class's WTPA damages.  *See id.* at Col. AB, Row 114.  Under the Settlement, Class Members will receive approximately 10.25% of their highest possible WTPA damages.

### PRELIMINARY APPROVAL AND MAILING OF NOTICES

41.     On February 4, 2022, Plaintiffs filed their Motion for preliminary settlement approval on a class and collective action basis.  ECF Nos. 19–21.

42.     On February 16, 2022, the Court issued an electronic Order scheduling a telephone conference for February 22, 2022, at 11:30 a.m.

43.     On February 22, 2022, the Court held a telephone conference with counsel for all Parties to discuss the Preliminary Approval Motion.  Later that day, the Court issued the Preliminary Approval Order.  *See* ECF No. 24.

44.     Class Counsel retained Rust Consulting on February 23, 2022.

45.     On February 25, 2022, Counsel for Defendants provided the contact information, social security numbers, last known mailing addresses, and last known telephone numbers of all Class Members to Rust Consulting.  Later that day, Class Counsel clarified for Rust Consulting that individuals with $0.00 in damages in Class Counsel's damages calculations (Ex. F) are not "Class Members" in this Action.

46.     Rust Consulting used the National Change of Address Database to obtain the most up to date mailing addresses of all Class Members.

47.     Between March 10 and 11, 2022, Class Counsel translated the Notice Materials into Spanish.  On March 16, 2022, Class Counsel provided the Noticed Materials in English and Spanish to Rust Consulting.  *See* Ex. 2 ¶ 6.

48.     On March 24, 2022, Rust Consulting confirmed there are eighty-seven (87) Class Members in this Action.  The same day, Rust Consulting mailed the Notice Materials in English and Spanish to all Class Members by First Class Mail.  A copy of the English language and Spanish language Class Notice mailed to Class Representative Valencia is attached as Exhibit C to Exhibit 1, the Stipulation.

49.     The Class Notice reflects each Class Member's estimated individual Settlement Share and the formula used to calculated it:

> Your "Settlement Share" is equal to all of your alleged unpaid overtime wages and spread-of-hours pay multiplied by two plus a portion of your alleged WTPA damages.  The "Net Settlement Amount" is the money remaining of the $350,000 after subtracting from it (a) all wages (multiplied by 2) being paid to Class Members as part of their Settlement Shares, (b) litigation costs, (c) attorney's fees, (d) service payments to Class Representatives, (e) the Claim Administrator's service fees, and (f) a temporary $20,000 reserve fund.  Class Counsel divided your individual alleged WTPA damages by the WTPA damages for all Class Members combined, yielding a percentage.  That percentage was multiplied by the Net Settlement Amount.  The resulting number, added to two times your alleged unpaid wages, equals your estimated Settlement Share.  Please note your estimated Settlement Share is only an estimate.  As noted, there is a temporary hold on $20,000 of the Settlement Payment, which may or may not be used up before the Lawsuit ends depending on several factors.  Whatever portion of the $20,000 Reserve Fund that is not spent will be added back into the Net Settlement Amount, thereby increasing each Class Member's Settlement Share.
> Live Lion will make a settlement payment to all class members who do not exclude themselves from this Settlement (known as the "Rule 23 Class Members").
> **BASED ON THE FOREGOING, YOUR ESTIMATED SETTLEMENT SHARE IS: $_____.**

Ex. C ¶ 3.

50.     The Class Notice explains to Class Members what the Action is about and, if they choose to do so, how to exclude themselves from or object to the Settlement.  *Id.* ¶¶ 1, 2, 7, 9.  It includes a description of the nature of the Action, the class action claims,

and why the Class Member is receiving Notice Materials. *Id.* ¶ 1. The Class Notice further explains Defendants' position and defenses and why the Action settled. *Id.* ¶ 2.

51. The Class Notice explains that Class Members do not have to do anything to receive a Settlement Check. *Id.* ¶ 4.

52. The Class Notice explains that Class Members give up rights under New York law in exchange for receipt of a Settlement Check as Rule 23 Class Members. *Id.* ¶¶ 5–6. It also explains that they give up rights under the FLSA in exchange for depositing/cashing their checks as FLSA Collective Members. *Id.* ¶ 6. The Class Notice further explains to Class Members that they are represented by Pechman Law Group PLLC ("PLG") as Class Counsel, but that they have the right to retain another attorney at their own expense. *Id.* ¶ 11. Finally, the Class Notice states that Class Members should contact Class Counsel, and not the Court, with questions. *Id.* ¶¶ 10, 11.

53. The Class Notice explains that Rule 23 Class Members will have 180 days from the date of the mailing of Settlement Checks to cash/deposit them. *Id.* ¶ 3. Checks not cashed by the 181st day after mailing will be void and their proceeds will revert to Defendants. *Id.* Defendants will pay half of each Settlement Share under IRS Tax Form 1099 and the other half under IRS Tax Form W-4. *Id.*

54. The Class Notice explains to Class Members that "Class Counsel will apply to receive one-third of the Settlement Payment (an amount equal to $116,666.00) for services they provided plus an additional amount, not to exceed $1,300.00, for costs incurred in the prosecution of the Lawsuit." *Id.* ¶ 3. The Class Notice also explains that Class Counsel will request "payment of fees to the Claims Administrator" not to "exceed $18,000." *Id.* Finally, it also states that Class Counsel "will ask the Court to approve service payments of $10,000 for Ramon Valencia and $5,000 to Norelvi Serrano for their invaluable services to the Class." *Id.*

55.     The Class Notice also explains that Class Members had until July 5, 2022, to exercise their rights to object to or opt-out of the Settlement. *Id.* ¶¶ 7, 9.  With respect to objections, the Class Notice states: "If you believe the Settlement is unfair or inadequate in any respect, you may object to the Settlement, either personally or through an attorney at your own expense, by mailing, by first-class mail, your written objection to the address below." *Id.* ¶ 9.

56.     In March 2022, Rust Consulting obtained a mailing address for this Action and a toll-free telephone number for Class Members to call with questions regarding the Settlement.  Attached as Exhibit 2 is the Affidavit of Abigail Schwartz of Rust Consulting, Inc. dated August 1, 2022.  *See* Ex. 2 ¶¶ 4–5.

57.     On March 30, 2022, Rust Consulting provided Counsel for Defendants with wire transfer information, so that Defendants could begin depositing funds into the QSF.

58.     Rust Consulting has confirmed that Defendants deposited $50,000 into the QSF on or about the first day of each month since April 2022.  *Id.* ¶ 14.  Defendants have two more $50,000 deposits to make in September and October 2022.  *See id.*; Ex. 1 § XV(2).

59.     Each week from March 25 through July 29, 2022, Rust Consulting has provided the Parties with weekly updates summarizing, *inter alia*, the number of: Notice Materials mailed and remailed to Class Members; skip traces performed; Class Members who opted out of or objected to the Settlement; and Notice Materials that could not be mailed to Class Members because of missing addresses.

60.     As of July 5, 2022, the end of the opt-out and objection period, Rust was unable to deliver the Notice Materials to twelve (12) Class Members.  Ex. 2 ¶ 10.

61.     No Class Member objected to or opted-out of the Settlement.  *Id.* ¶¶ 12–13.

62.     If the Court approves the Settlement, Rust will continue to perform several settlement administration duties, including issuing and disseminating Settlement Checks

and tax documents and tracking the number of Class Members who deposit their Settlement Checks and thereby become FLSA Collective Members. *Id.* ¶ 15.

63.     Attached as Exhibit D to the Stipulation is a proposed Final Approval Order approving the Settlement embodied in the Stipulation as a just and reasonable resolution under Rule 23 of the Federal Rules of Civil Procedure, approving the Settlement under the FLSA, finding that the Notice Materials were adequate and that their dissemination and contents met all due process requirements, approving Class Counsel's attorneys' fees and costs, approving the Class Representatives' service awards, approving the Claims Administrator's fees, and dismissing this Action as approved with prejudice but retaining jurisdiction over it for enforcement purposes.

## ARGUMENT

**I.     The Court Should Grant the Motion for Final Approval in Full**

64.     For the reasons detailed in the accompanying Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, the Court should grant the Motion and adopt in full the Proposed Final Approval Order. *See* Ex. D.

**II.    Class Counsel Should Be Awarded Its Fees and Costs Requested**

65.     PLG represented Plaintiffs and the class and collective in this Action.  PLG's attorneys are competent and experienced wage-and-hour counsel.  As set forth in their retainer agreements with the firm, PLG agreed to represent Plaintiffs purely on a contingency fee basis of 33.33% of whatever amount was recovered after reimbursement of costs incurred in the prosecution of the Action.  This means that if the Action resulted in no recovery whatsoever, PLG would have had no recovery of fees whatsoever and, in fact, lost its costs incurred prosecuting the Action.

A.      **Class Counsel's Background and Experience**

66.     PLG specializes in representing both workers and businesses in workplace disputes.  We have advocated for busboys and construction workers as well as corporate executives and Fortune 500 companies.  Our experience with and ability to see all angles of a dispute has earned us a reputation for resolving difficult cases.

67.     PLG meets all relevant criteria for appointment as class counsel under Rule 23.  The firm has done substantial work identifying, investigating, prosecuting, and settling the claims; has substantial experience prosecuting and settling wage-and-hour actions, including class actions; is well-versed in wage-and-hour and class action law; and is well-qualified to represent the interests of the Class.  PLG has not identified any other lawsuits against Defendants by Defendants' employees.  PLG is committed to spending resources and time to prosecuting and settling this Action, and to date has expended significant resources doing so.

68.     Since graduating from Fordham Law School in 1983, I have specialized in labor and employment law.  I was an attorney at Skadden, Arps, Slate, Meagher & Flom LLP; Vladeck, Waldman, Elias & Engelhard, P.C.; the Daily News; and Lambos & Giardino / Lambos & Junge.  From 1996 through 2014, I was a partner at Berke-Weiss & Pechman LLP, the predecessor firm to PLG.  On January 1, 2015, I founded PLG.

69.     I am licensed to practice law in the State of New York and am admitted in all United States District Courts of New York as well as the Second Circuit Court of Appeals.  I am also licensed to practice in the State of New Jersey and am admitted in the United States District Court for the District of New Jersey.

70.     Over the past several years, I have handled over 300 wage-and-hour cases, representing both employees and employers, including Fortune 500 corporations.  *See Sajvin v. Singh Farm*, No. 17-cv-4032, 2018 WL 4214335, at *9 (E.D.N.Y. Aug. 13, 2018)

(noting that "Pechman's experience, expertise, and reputation in this District [warranted] an award slightly above the current stagnant hourly rate") (Reyes, M.J).   I have been appointed class counsel or counsel for FLSA collective classes in several wage-and-hour cases.   *See, e.g., Soriano v. D&J Export, Inc.*, No. 18 Civ. 194 (E.D.N.Y. 2019) (appointing PLG, including Louis Pechman and Gianfranco J. Cuadra, as class counsel and approving settlement); *Manley v. Midan Rest., Inc.*, No. 14 Civ. 1693, 2017 WL 1155916, at *9 (S.D.N.Y. Mar. 27, 2017) ("Louis Pechman and the Pechman Law Group have significant experience representing both employers and employees in wage and hour actions in this District. . . . Louis Pechman has an excellent reputation in this District in the field of employment law."); *Carino v. Broadway & 166, LLC*, No. 10 Civ. 8506, Docket No. 35 at *4 (S.D.NY. May 1, 2013) (recognizing that Louis Pechman "used his considerable expertise in this wage and hour case to achieve an excellent result for the Class in a highly efficient manner"); *In re Chickie's and Pete's Wage and Hour Litigation*, No. 12 Civ. 6820, Docket Entry No. 80 at *1 (E.D. Pa. Mar. 28, 2013) (consolidating cases and appointing Louis Pechman as lead counsel); *Duchene v. Michael Cetta, Inc.*, No. 06 Civ. 4576, 2009 WL 5841175, at *2 (S.D.NY. Sept. 10, 2009) (recognizing Louis Pechman's "extensive experience in litigating wage and hour class actions").

71.     I speak frequently on employment law issues, with a focus on wage-and-hour topics.   Since 2010, I have moderated an annual program at the New York County Lawyers' Association on "How to Handle a Wage and Hour Case."   I last moderated this program in November 2021.   On October 6, 2015, I moderated a program at the City Bar on "Current Issues in Settlement of FLSA Cases," which included Judge Lewis A. Kaplan, Magistrate Judge Ronald L. Ellis, and Judge Brian M. Cogan.   On September 30, 2015, I moderated a Bloomberg BNA webinar entitled "Top Ten FLSA Litigation Issues: 2015 Edition," which included Magistrate Judge Ramon E. Reyes.   On March 2, 2016, I spoke

at the New York Hospitality Restaurant Alliance on tipping policies at New York City restaurants.  On March 11, 2016, I spoke at the New York City Employment Law Institute on a panel titled, "Prosecuting & Defending Wage and Hour Cases."  On September 29, 2016, I spoke in a panel, which included Magistrate Judge Steven M. Gold, in a Bloomberg BNA webinar titled "Top Ten FLSA Litigation Issues: 2016 Edition."  On October 24, 2016, I moderated a program at the New York City Bar titled "FLSA Settlement Issues One Year After *Cheeks*," presented by a panel including Chief Magistrate Judge Debra Freeman, District Judge Richard Sullivan, and Magistrate Judge Marilyn Go.  On June 12, 2017, I served as a panelist in the American Conference Institute's 30th National Forum on Wage & Hour Claims and Class Actions as part of a presentation titled "Trends in Wage & Hour Class & Collective Actions."  Every year since 2017, I have moderated a New York City Bar CLE-accredited program titled "FLSA Math: How to Calculate Wage-Related Damages."  I was also Chair of the Restaurant and Hospitality Law Committee of the Bar of the City of New York from 2014 to 2017.  I am also a frequent contributor to the New York Law Journal.  My recent articles include *Cheeks v. Freeport Pancake House: Five Years Later* (Aug. 6, 2020), *Rights of Undocumented Workers in Wage Theft Cases* (Mar. 13, 2020), and *Prevailing Wage Law in New York's Construction Industry* (Nov. 22, 2021).  I serve as an Adjunct Professor at Fordham University School of Law, where I teach a course titled "Wage Theft: Employee Rights and Employer Responsibilities."

72.     PLG is "A-V" rated by Martindale-Hubbell, and I have been selected by my peers for inclusion in The Best Lawyers in America and in New York Super Lawyers since 2007.  PLG has been selected by Best Lawyers as a "Tier 1" New York City law firm in the areas of "Employment Law – Individuals" and "Employment Law – Management" every year from 2017 to 2022.  I have also been selected as a Fellow of the American Bar Association, an honorary organization limited to 1% of attorneys who have demonstrated

outstanding achievements and dedication to the highest principles of the legal profession. I was recognized in 2021 as one of the Law Dragon 500 leading U.S. Corporate Employment lawyers.

73.     Since 2013, my hourly billable rate has been $600 for all clients.  Over 300 of my clients have paid my fees at this rate throughout the last several years, including an advertising company, a shoe manufacturer, a money management firm, several restaurants, bakeries, a Broadway theater, a financial recruiting firm, a security guard company, a hedge fund, and a Fortune 100 transportation company.  PLG also represents individuals, such as managing directors at Wall Street firms, executives, and other individuals, who retain my services at my $600 per hour rate.  The United States District Court, Southern District of New York has awarded me my regular hourly billable rate of $600 in a contested fee application following a bench trial successfully first-chaired by Mr. Cuadra in a wage-and-hour case, *see Espinosa v. Perez*, No. 18 Civ. 8855, 2020 WL 1130743, at *1, 4 (S.D.N.Y. Mar. 9, 2020) (adopting Report & Recommendation awarding Pechman $600 per hour), and in a wage-and-hour case resulting in a default judgment, *see Augusto Corrales v. AJMM Trucking Corp.*, No. 19 Civ. 4532, 2020 WL 1911189, at *4 (S.D.N.Y. Apr. 20, 2020).

74.     Gianfranco J. Cuadra, my partner at PLG working on this matter, received his J.D. degree *magna cum laude* from Hofstra Law School in May 2009, where he was Research Editor of the Hofstra Law Review and an honorary member of the National Order of Scribes for outstanding legal writing.  Mr. Cuadra is admitted to practice in the United States District Courts for the Eastern, Western, and Southern Districts of New York and is a member in good standing of the New York State Bar.  Prior to joining PLG, Mr. Cuadra worked as an associate attorney at Winston & Strawn LLP.  He first worked at PLG as an associate attorney from March 2015 through December 2020.  Since January

1, 2021, Mr. Cuadra has been a partner at PLG.  Since 2015, Mr. Cuadra has litigated over 130 wage-and-hour cases ranging from individual plaintiff to class and collective actions on behalf of both employees and management.

75.    Mr. Cuadra has presented in numerous CLE-accredited programs, most of which concern wage-and-hour issues.  Every year since 2017, Mr. Cuadra has served as a panelist in a New York City Bar program titled "FLSA Math: How to Calculate Wage-Related Damages," which he last did in October 2021.  On November 15, 2018, Mr. Cuadra served as a panelist in a day-long mediator training program organized by the United States District Court, Southern District of New York on how to mediate wage-and-hour disputes under the FLSA and the NYLL.  On May 6, 2020, Mr. Cuadra served as a panelist in a New York City Bar webinar titled "Employment During a Pandemic: COVID-19 and the Major Issues Affecting New York Workplaces," where he presented on, *inter alia*, major wage-and-hour issues arising in the wake of the COVID-19 pandemic.  On April 13, 2021, Mr. Cuadra presented in a New York City Bar webinar titled "How to Handle a Prevailing Wage Matter in New York."  On June 1, 2021, Mr. Cuadra again presented in a New York City Bar webinar titled "Classifying Workers: Employed, Jointly Employed, or Independent Contractor," concerning misclassification issues in wage-and-hour actions.  On November 22, 2021, Mr. Cuadra published an article in the New York Law Journal titled *Prevailing Wage Law in New York's Construction Industry*, concerning the litigation and settlement of prevailing wage actions under Article 8 of the NYLL.  On March 4, 2022, Mr. Cuadra moderated and presented in the wage-and-hour panel of the New York City Bar's annual Employment Law Institute.  On March 8, 2022, Mr. Cuadra presented on the latest wage-and-hour issues and damages calculations to approximately forty arbitrators of the American Arbitration Association.  In mid-September 2022, Mr. Cuadra will host a wage-and-hour workshop as part of the New York State Bar's annual

Labor & Employment Law Conference.  Mr. Cuadra is a native Spanish speaker, the language of both Plaintiffs.

76.     Mr. Cuadra's hourly rate at PLG is $500 per hour for all clients.  PLG's clients who have paid this rate for Mr. Cuadra's services include a Fortune 100 transportation company, a shoe manufacturer, numerous executives and upper-level managers and company board members, a financial recruiting company, a non-profit healthcare company, a security company, and several restaurants.

77.     Mirian Albert received her J.D. degree from CUNY School of Law in May 2020, where she served as Staff Editor for CUNY Law Review.  She is admitted to practices in the United States District Courts for the Southern and Eastern Districts of New York.  Ms. Albert is a member in good standing of the New York State Bar.  During her employment at PLG, from October 2020 to May 2022, Ms. Albert was actively involved in the ligation of over twenty-five wage-and-hour matters.  Ms. Albert independently conducted client meetings, drafted and filed pleadings, drafted discovery requests and responses, and participated in pretrial conferences, including settlement conferences. Ms. Albert is a native Spanish speaker, the native language of both Plaintiffs. Ms. Albert's hourly rate at PLG was $225 for all clients.

**B.     Class Counsel's Hourly Rates and Hours Billed Are Reasonable**

78.     As attorneys' fees for their work performed in this Action, Class Counsel requests 33.33% of the QSF, totaling $116,666.  As is explained in the accompanying Memorandum, this request is reasonable as an adequate percentage of the fund.  A lodestar cross-check further confirms that Class Counsel's requested fees are reasonable and should be granted.  PLG's contemporaneous time records are enclosed as Exhibit 3.

79.     Below is a chart summarizing the specific professionals, their hourly rates, and their total time worked on the Action:

| Attorney's Name | Position | Hours Billed | Hourly Rate | Fees |
|---|---|---|---|---|
| Louis Pechman | Partner | 13.70 | $600 | $8,220 |
| Gianfranco J. Cuadra | Partner | 95 | $500 | $47,500 |
| Mirian Albert | Associate | 65.10 | $225 | $14,647.50 |

**TOTAL FEES:   $70,367.50**

80.     Based on Class Counsel's extensive experience in precisely this type of litigation and our thorough familiarity with the factual and legal issues in this case, we believe that the hours reported, compiled from contemporaneous time records maintained by each professional participating in the case, are reasonable and were necessarily expended on the Action.  Furthermore, the hourly rates of the PLG attorneys who worked in this Action are reasonable because they are the rates actually paid by our hourly-paying clients.

81.     The amount requested in fees is also reasonable because it is only 39.685% more than Class Counsel's lodestar.  In other words, the lodestar multiplier in this matter is only 1.6580, and, as such, the fees requested should be approved.

82.     In addition, PLG also requests that the Court grant its request for reimbursement of reasonable out-of-pocket expenses incurred in the prosecution of the Action, as summarized in the chart below.   Two invoices evidencing the cost reimbursement requested are attached as Exhibit 4.

| Class Counsel's Expense Incurred & Description | Amount |
|---|---|
| Filing fee in the Eastern District of New York.  *See* ECF No. 1 docket. | $402 |
| Mediation cost.  *See* Ex. 4 at 1 (first invoice dated 9/24/21). | $300 |
| Mediation cost.  *See* Ex. 4 at 2 (second invoice dated 10/28/21). | $437.50 |

**TOTAL COSTS: $1,139.50**

83.     For the foregoing reasons, as well as those set forth in the accompanying Memorandum, the Court should grant Class Counsel's requests for fees and costs.

### III.   The Court Should Approve the Service Awards Requested

84.   Valencia and Serrano have fairly and adequately represented the interests of all Class Members, have no known conflicts with them, and have provided valuable input to Class Counsel at every stage of this Action.

85.   Valencia assisted with the preparation of the Complaint, provided several wage payment and time records as clear examples of alleged NYLL and FLSA violations against Defendants, attended and participated in the mediation, identified and recruited Serrano as an opt-in Plaintiff, and shouldered the risks incurred as being the only named Plaintiff and Class Representative.

86.   Serrano provided wage payment and time records and attended and participated in the mediation as the sole opt-in Plaintiff.  She provided helpful information at the mediation about Defendants' alleged wage payment practices, for example, and identified several potential Class Members who she claimed also sustained damages under Defendants' common policies and practices.

87.   Because of their significant contributions to the Action and its ultimate resolution, we respectfully request that the Court grant the Class Representatives' request for service awards of $10,000 for Valencia and $5,000 for Serrano.  Combined, the service awards amount to less than 5% of the total Settlement Amount.

### IV.   The Court Should Approve the Settlement Administrator's Fees Requested

88.   As noted above and in the attached Affidavit of Abigail Schwartz dated August 1, 2022, Rust Consulting has performed and will continue to perform significant work as Claims Administrator.  *See generally* Ex. 2.

89.   For its worked performed and to be performed, the Court should approve Rust Consulting's request of $11,264 in fees.  *Id.* ¶ 16.

90.     **WHEREFORE**, for the reasons set forth in this Affirmation and in the accompanying Memorandum of Law, the Class Representatives respectfully request that the Court enter the Final Approval Order (Ex. D).

91.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:  New York, New York
     August 5, 2022


                              _s/ Louis Pechman_
                               Louis Pechman